UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

JAMES NADEAU,                           )
                                        )
          Plaintiff,                    )
                                        )
     v.                                 )    Case No. 14-cv-64
                                        )
MARY HITCHCOCK MEMORIAL                 )
HOSPITAL,                               )
                                        )
          Defendant.                    )

## OPINION AND ORDER

Plaintiff James Nadeau claims that his former employer,
Defendant Mary Hitchcock Memorial Hospital ("Hospital"),
discriminated against him on the basis of a disability.  Nadeau
also claims retaliation in breach of an implied employment
contract, and breach of the covenant of good faith and fair
dealing.  The Hospital has moved for summary judgment on all
three claims, arguing that Nadeau was fired from his job because
of performance and behavioral issues.  For the reasons set forth
below, the motion for summary judgment is **granted** and this case
is **dismissed.**

## Factual Background

Nadeau suffers from Crohn's disease, which is a form of
inflammatory bowel disease ("IBD").  While his disease at times
causes cramping and bloody stools, it can also result in a loss
of appetite, low energy, and fatigue.  Symptoms of Crohn's
disease may be aggravated by diet and increased stress.

Following surgery in the 1990s, Nadeau was able to function without medical attention or medication until he suffered a flare-up in late 2011.  He suffered another flare-up in the fall of 2012, which he attributes to work-related stress.

Nadeau began working for the Hospital in September 2006. His first position was as a supply handler at a Hospital warehouse in Lebanon, New Hampshire.  Nadeau also performed work for the Hospital periodically in other locations, including his home in Vermont.  In early 2007, he was promoted to the position of supply supervisor.  Until 2012, he had received positive reviews and had never received any verbal or written warnings with regard to his work performance.

In April 2012, Katrina Geurkink began working for the Hospital as Manager of Organizational Effectiveness for the supply chain.  Her duties included managing the Lebanon warehouse.  With her background in organizational development, Geurkink was responsible for employing a management methodology known as Lean Sigma Six.  According to Geurkink's affidavit, Lean Sigma Six is a method used to improve organizational performance, relying on a disciplined, collaborative approach to identify and eliminate wasteful processes.

Nadeau reported directly to Geurkink, and their warehouse offices were across the hall from each other.  The two had occasional one-on-one meetings, both formal and informal.

According to Nadeau, Geurkink typically limited the content of those meetings to day-to-day responsibilities, and it was often hard to have discussions about other topics, including his health.  Geurkink asserts that she met with Nadeau more than any of her other direct reports.

Soon after assuming her managerial position at the Hospital, Geurkink came to believe that Nadeau had trouble prioritizing tasks, managing his time, and satisfying deadlines.  She expressed her concerns to her immediate supervisor, David Walker, and to Nadeau's former supervisor, David Fittro.  Walker and Fittro informed Geurkink that they had made similar observations.[1]  Walker also revealed that Nadeau had occasionally acted in an unprofessional manner, including angry outbursts.  According to Geurkink, Walker expressed doubts about whether Nadeau continued to be a good fit for a supervisory position given that the focus of the position was shifting toward process improvement, problem solving, and team building.

During the spring and summer of 2012, Geurkink spoke with

---

[1]  Nadeau objects to any statements by Walker and Fittro as inadmissible hearsay.  The Court finds that these statements are admissible because they pertain to Geurkink's state of mind as she made employment-related decisions, and not to the truth of the statements.  *See McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) ("[Plaintiff] is attacking the *reliability* of the evidence supporting [Defendant's] conclusions.  In a discrimination case, however, we are decidedly not interested in the truth of the allegations against [P]laintiff.  We are interested in what *motivated* the employer; the factual validity of the underlying imputation against the employee is not at issue.") (internal quotation marks and citation omitted).

Nadeau about his work performance.  In his deposition, Nadeau testified that Geurkink shared with him certain task lists and deadlines, noted his difficulties with meeting deadlines, and made clear the expectations going forward.  ECF No. 40-30 at 33 (Nadeau Dep. at 132-33).  In addition to feedback about his performance, Geurkink gave Nadeau a book about Lean Six Sigma and time management.  The parties agree that Nadeau did not read the book, with Nadeau explaining that reading at work would have taken time away from his other tasks, and that he was "unwilling to read the book at home."  ECF No. 45-2 at 2 (Nadeau Aff., ¶ 9).

Geurkink has testified that during their meetings, Nadeau at times became angry and confrontational.  Nadeau denies these characterizations, but confirms that he became defensive when faced with Geurkink's criticisms.  After one particular discussion in June 2012, Geurkink sent an email the next day to David Walker, reporting that Nadeau had "apologized for yesterday and was calm, clear and professional."  ECF No. 40-2 at 1. Walker responded that he was glad things had "progressed," and reassured Geurkink that she was "doing exactly what needs to be done to set professional standards."  *Id.*  Nadeau acknowledges apologizing to Geurkink around that time.  ECF No. 40-30 at 33 (Nadeau Dep. at 128-29).

As of August 2012, Geurkink was not seeing improvements in Nadeau's time and task management.  She therefore began

4

maintaining a list of tasks that Nadeau was to perform within certain deadlines.  According to Geurkink, between August 9, 2012 and November 27, 2012 Nadeau failed to meet established deadlines approximately 65% of the time.

Geurkink avers that in addition to missing deadlines, Nadeau provided her with inaccurate information and bore responsibility for delivery delays that required the Hospital to cancel surgeries.  Nadeau disputes whether those delays were his fault.

In late August 2012, Nadeau submitted a request for leave to take a vacation day on November 23, 2012, the day after Thanksgiving.  He also requested vacation time before and after Christmas and the New Year.  Given that the Hospital was going to be opening a new outpatient facility in November 2012, Geurkink contends that she was uncertain about staff coverage needs and was therefore unable to immediately grant Nadeau's requests.

On November 5, 2012, Geurkink informed Nadeau that she was unlikely to approve all of his leave requests.  She asked Nadeau if he had a preference, and he informed her that he preferred to take time off around Christmas.  On November 12, 2012, Geurkink allowed Nadeau to take two days off on November 15 and 16. According to Geurkink, Nadeau did not attribute this leave time to any medical issues.  Nadeau does not recall whether he informed Geurkink of the reason for his absence.  ECF No. 40-30 at 39 (Nadeau Dep. at 152).  He now submits that he was forced to

miss work due to an intestinal flare-up that required hospitalization, and that the flare-up was caused by work stress.

Geurkink was aware that Nadeau suffered from Crohn's disease, which she understood to be a form of intestinal disorder.  She did not consider Nadeau to be disabled.  Her affidavit states that Nadeau never requested any sort of accommodation, never reported any job limitations, and did not appear to be limited by his disease.

Nadeau submits that Geurkink knew more about his disease than her testimony suggests.  His affidavit reports that he informed Geurkink when one of his medications was affecting his work efficiency.  ECF No. 45-2 at 3 (Nadeau Aff., ¶ 15).  In November 2012, he reportedly told Geurkink that his health was "going downhill" and that his medications were ineffective.  ECF No. 40-30 at 38 (Nadeau Dep. at 147-48).  In response, Geurkink encouraged him to "get better" and to "do what [he] needed to do."  *Id.* (Nadeau Dep. at 148).  As discussed below, Nadeau took an extended medical leave shortly thereafter.

Despite Geurkink's apparently sympathetic response to his illness, Nadeau was frustrated by his inability to discuss his health issues with her.  He testified in deposition that when he tried to discuss his health in November 2012, Geurkink insisted that he schedule a special meeting to do so.  *Id.* (Nadeau Dep. at 146-47).  Given that he and Geurkink were already meeting once or

twice per week to discuss work-related issues, Nadeau did not see the need to schedule an additional meeting.  Accordingly, he did not follow up on Geurkink's suggestion.

Nadeau's only requested accommodation with respect to his illness was access to a bathroom.  *Id.* at 38 (Nadeau Dep. at 148).  Such access was generally provided, although bathrooms were not available at one of the locations where he attended meetings.  Nadeau did not inform Geurkink that bathroom access at the meeting location was a problem.  *Id.* at 39 (Nadeau Dep. at 150).  Nadeau now claims that he was unaware he could request a an accommodation that might improve his work performance.  ECF No. 45-2 at 3 (Nadeau Aff., ¶ 12).

On November 14, 2012, Geurkink told Nadeau that he would need to work the day after Thanksgiving, as the new facility was going to be open that day.  Geurkink was reportedly balancing the vacation needs of other employees, some of whom were experiencing difficult family issues.  Nadeau responded with frustration, stating that he had always been given that day off.  He did not cite any medical reason for requiring leave around Thanksgiving.

Geurkink spoke with her supervisor about Nadeau's behavior and was advised to contact Human Resources.  She did so on November 19, 2012, and scheduled a meeting with Senior Employee Relations Specialist Steve Woods.  That same day, and unbeknownst to Geurkink, Nadeau contacted Human Resources as well, explaining

that he had plans to visit family during the Thanksgiving holiday and that he disagreed with management's ability to dictate his vacation days.

Nadeau's email to Human Resources stated that in denying his leave request for the day after Thanksgiving, Geurkink had cited his absences on November 6, 7, 15, and 16.  As those prior absences were health-related, Nadeau's email expressed dismay that Geurkink would "throw my illness in my face that I took time off for it."  ECF No. 40-13 at 2.  Nadeau also noted that he had been having difficulty securing time with Geurkink to discuss various issues, including his illness and his perceived work overload.  *Id.*

On November 20, 2012, Steve Woods spoke with Nadeau about his complaints.  During that meeting, Nadeau did not state or suggest that Geurkink was discriminating against him.  Woods subsequently looked into the question of post-Thanksgiving leave and found that Geurkink had legitimate business reasons for denying Nadeau's request.

Nadeau left work early without permission on November 23, 2012 – the day for which his leave request had been denied.  Nadeau claims that he informed Geurkink that morning that he would be leaving early.  When Geurkink tried to reach him on his cell phone, he declined to answer and did not return her call.  On November 26, 2012, Nadeau sent Geurkink an email informing her

8

that he would not accept any one-on-one meetings with her until Human Resources had finished investigating his concerns.

On November 27, 2012, Geurkink issued Nadeau a written warning with regard to his work performance.  The warning documented incidents going back several months, and listed corrective actions that Nadeau needed to accomplish within established deadlines.  Those actions included developing a time management system, showing improvement in meeting deadlines, and acting in a professional and respectful manner.  Nadeau claims that Geurkink issued the written warning in retaliation for his communications with Human Resources on November 19.

That same day, Steve Woods met with Geurkink and Nadeau to discuss the written warning.  Nadeau reports that the discussion with Woods and Geurkink covered his time management issues, albeit in the context of what he perceived as insufficient staff support.  Nadeau further submits that he raised concerns about the additional workload being assigned by Geurkink, and the effect of his deteriorating health on his management abilities. ECF No. 45-2 at 4 (Nadeau Aff, ¶ 23).  Nadeau claims that he ultimately asked to be relieved of his supervisory role, citing workload, under-staffing, and his health.  *Id.*  According to Nadeau's affidavit, Woods referred him to the Family Medical Leave Act.  *Id.* (Nadeau Aff., ¶ 24).

The question of Nadeau's workload was explored during his

9

deposition.  Nadeau testified that his workload increased in 2008 or 2009 after another supervisor, June Brown, left the Hospital: "[w]hen June Brown left, I was the only one there.  So I basically oversaw everything at that point."  ECF No. 40-30 at 22 (Nadeau Dep. at 85); *see also id.* at 28 (Nadeau Dep. at 107-08).  After Brown's departure, Nadeau found himself in charge of a print shop, linen services, the "Third World" building, and a storage center known as the "210 tunnel."  *Id.* at 22 (Nadeau Dep. at 85).  In 2011, he became involved in preparations for a new facility at Heater Road.

After a flare up of his IBD in 2011, Nadeau expressed workload concerns to his then-supervisor, David Fittro.  Nadeau did not communicate to Fittro that his concerns were related to a medical condition.  *Id.* at 20 (Nadeau Dep. at 74).  When Geurkink was hired in 2012, Nadeau hoped that she would review his tasks and reassign some of the duties he had inherited from June Brown.  *Id.* at 32 (Nadeau Dep. at 124).  Instead, Geurkink allegedly added to his duties, requiring him to generate new reports; partially manage the Heater Road facility; supervise the metro cart maintenance plan; organize fire drills; direct communications with vendors; and place monthly orders as needed.  ECF No. 45-2 at 2 (Nadeau Aff., ¶ 8).

On or about December 3, 2012, Nadeau informed Geurkink and Woods that he would be taking time off due to a medical issue.

Geurkink informed Nadeau that any corrective action deadlines would be put on hold while he was out on leave, and that new deadlines would be established once he returned.  She also reminded Nadeau of the deadline for filing a grievance with respect to the November 27, 2012 written warning.

On December 4, 2012, Nadeau notified Geurkink via email that he would like to proceed with the first step of the grievance process.  Because he was scheduled to go on leave, his grievance meeting was delayed until after he returned to work.  Nadeau left work in early December 2012, and on December 30, 2012 informed Geurkink that he would be out of work indefinitely.

While Nadeau was out on leave, issues arose with regard to access to his work emails and work laptop.  In the course of performing his job, Nadeau would receive emails from vendors and other Hospital employees.  Geurkink avers that in order to maintain efficient operations in Nadeau's absence, she obtained permission to access his emails while he was on leave.  Nadeau contends that prior to going out on leave he made arrangements for vendors to contact others at the Hospital, including Geurkink, in his absence.  He concedes, however, that Geurkink had legitimate reasons for accessing his emails.  ECF No. 40-30 at 49 (Nadeau Dep. at 192-93).

While accessing Nadeau's emails, Geurkink discovered communications, sent by Nadeau to Hospital employees during his

11

leave, that she deemed unprofessional.  When Nadeau returned to
work, she confronted him with those emails.

According to Hospital policy, Nadeau was not allowed to work
while on medical leave.  He nonetheless asked to maintain
possession of his work laptop so that he could review his FMLA
benefits.  Geurkink denied this request and required Nadeau to
return the laptop, in part because another employee was having
trouble with her own laptop and needed Nadeau's as a temporary
replacement, and in part because Geurkink believed Nadeau had
other means of accessing benefits information.  Nadeau submits
that Geurkink's actions, which included shutting off his access
to the work network, interfered with his ability to obtain
benefits information.  He also claims that no one else used his
laptop while he was on leave.

Nadeau did not return the laptop immediately, and left
Geurkink a voicemail stating something about getting out "her
fishing pole."  ECF No. 40-30 at 51 (Nadeau Dep. at 201).
Geurkink consulted with Woods, who interpreted the voicemail as a
threat by Nadeau to have Geurkink fired.  In deposition, Nadeau
characterized the comment as a threat to take legal action.  *Id.*
Woods reassured Geurkink that she was acting appropriately with
regard to both the laptop and access to Nadeau's emails.

Nadeau did eventually return the laptop.  Geurkink tried to
use it to access warehouse security codes, but found that the

12

codes were not on the computer and that some files had been removed.  The removed files raised concerns, as Geurkink believed that some contained proprietary and confidential information. Nadeau explains that because the laptop was going to be used by another employee, he had removed his confidential employee information and saved it on a thumb drive.  He also contends that the security codes were kept in a locked filing cabinet at the warehouse.

Nadeau returned to work in late February 2013.  He returned without any sort of declared limitations, and made no new requests for accommodations with respect to his health or disability.  Purportedly as a result of his conduct while on leave, he was prohibited from taking his assigned laptop home with him.  Nadeau claims that this prohibition was imposed in retaliation for his November 2012 complaints to Human Resources. On March 4, 2013, he sent a second complaint to Human Resources.

On March 12, 2013, Geurkink gave Nadeau a detailed letter setting forth her account of his actions since November 27, 2012, including issues relating to his laptop and email communications, and her expectations going forward.  ECF No. 40-7.  Among other things, her letter asked him to consider whether he could meet her expectations, and offered that "[i]f there is any additional training, support, or accommodations that you require to perform the essential functions of your job, please don't hesitate to let

13

me know . . . .  I am willing to offer whatever reasonable support I can." *Id.* at 3.  That same day, Nadeau met with Woods and Geurkink to discuss expectations, and was given a letter resetting the corrective action deadlines to April 5, 2013.

In Geurkink's opinion, Nadeau's job performance through April 5, 2013 did not improve.  For example, although Nadeau disputes her claim, Geurkink asserts that he missed deadlines 40% of the time.  On April 8, 2013, Woods again met with Nadeau and Geurkink.  Nadeau contends that he had completed all of the tasks requested, while Woods believed that Nadeau's work "plainly did not meet the expectations of the [March 12, 2013 letter]."  ECF No. 40-32 at 4 (Woods Aff., ¶ 13).  Nadeau now claims that Geurkink was "setting me up for failure," harassing him and micro-managing his work.  ECF No. 45-2 at 6 (Nadeau Aff., ¶ 44).

On April 23, 2013, Nadeau's grievance with respect to the November 27, 2013 written warning was heard by Vice President Gail Dahlstrom.  During that meeting, Nadeau reportedly tried to raise issues set forth in his November 19, 2012 and March 4, 2013 letters, but was told that those concerns would not be addressed at that time.  In a letter dated May 6, 2013, Dahlstrom upheld the warning "as written," explaining that although Nadeau's "primary argument was that you did not have ample opportunity to clarify expectations," the evidence did not support his claim. ECF No. 40-33, Ex. O.  In response to Nadeau's retaliation claim,

14

Dahlstrom noted that the events documented in the written warning pre-dated his November 19, 2012 complaint to Human Resources.

On April 30, 2013, Geurkink and Woods met with Nadeau and informed him that he had not met the established expectations and deadlines.  Geurkink provided Nadeau with a draft of a final warning, allowing him until May 24, 2013 to make the necessary corrections.  Geurkink told Nadeau that she would hold off on issuing the final warning until May 17, 2013 so that he could pursue other employment opportunities without the final warning having been issued.

Geurkink issued the final warning on May 17, 2013, setting a new deadline of June 7, 2013 to meet expectations and deadlines. When asked in his deposition why he believes he received the final warning, Nadeau testified that he was not "meeting [Geurkink's] expectations."  ECF No. 40-30 at 56 (Nadeau Dep. at 218-19).

In June 2013, Geurkink reported to Woods that Nadeau continued to act unprofessionally and was failing to meet her expectations.  Geurkink and Woods discussed the possibility of a demotion, although Geurkink feared that Nadeau's lack of professionalism would adversely affect others in the warehouse. Nadeau was terminated on June 11, 2013.

On or about June 19, 2013, Gail Dahlstrom heard Nadeau's grievance with respect to his final warning.  Nadeau did not

15

raise any issues about his disability at that time, as Dahlstrom had allegedly precluded him from discussing those issues in the prior hearing.  In a letter dated July 2, 2013, Dahlstrom concluded that the final warning was properly issued because Geurkink "was unable to depend on [Nadeau] to provide sufficient leadership in the warehouse to ensure standard work as defined and implemented or to oversee improvement efforts through problem solving and organization."  ECF No. 40-17 at 1.  In response to Nadeau's complaint about Geurkink accessing his emails, Dahlstrom found that Geurkink had followed protocol and received the necessary permission to access his files.

On July 10, 2013, Dahlstrom heard Nadeau's grievance regarding his discharge.  There was again no mention of a disability.  Nadeau contends that he raised hostile work environment and retaliation claims, but that his concerns were not addressed.  ECF No. 45-2 at 7 (Nadeau Aff., ¶ 46).  In a letter dated July 24, 2013, Dahlstrom upheld the discharge, explaining as follows:

> Your basic argument has been that you either did not agree with or did not understand the expectations established for you.  This argument supports Ms. Guerkink's [sic] assessment that you do not appear to understand or accept the responsibilities of the Supervisor of the Warehouse.  Therefore, Ms. Guerkink's [sic] action to remove you from that role was appropriate.

ECF No. 40-18 at 1.

In a decision dated August 28, 2013, a grievance panel

16

upheld Nadeau's firing, concluding that "[a]ll managerial actions appear to have been taken pursuant to the setting of expectations and the failure of Grievant to meet those expectations."  ECF No. 40-19 at 1.

## Discussion

I.   Summary Judgment Standard

Nadeau contends that he was terminated because of his disability and in retaliation for his complaints to Human Resources.  The Hospital has moved for summary judgment on all claims.  Federal Rule of Civil Procedure 56 allows the Court to enter summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  A fact is material if it might affect the outcome of the suit under the governing law." *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009).  In considering summary judgment, the Court construes the evidence "in the light most favorable to the nonmoving party, and draw[s] all inferences and resolv[es] all ambiguities in favor of the nonmoving party."  *Doro v. Sheet Metal Workers' Int'l Ass'n*, 498 F.3d 152, 155 (2d Cir. 2007).

II.  Discrimination Under the VFEPA[2]

Count One of the Complaint alleges violations of Vermont's Fair Employment Practices Act ("VFEPA").  The VFEPA makes it unlawful for any employer to discriminate against a qualified disabled individual.  21 V.S.A. § 495(a)(1); *see Colby v. Umbrella, Inc.*, 2008 VT 20, ¶ 9, 184 Vt. 1, 955 A.2d 1082, 1088. A "qualified" disabled individual is "[a]n individual with a disability who is capable of performing the essential functions of [his] job . . . with reasonable accommodation to the disability."  21 V.S.A. § 495d(6).  An "individual with a disability" is "a person who . . . has a physical or mental impairment which substantially limits one or more major life activities."  21 V.S.A. § 495d(5)(A).  The statute provides that in the employment context, a "substantially limited" person is one "who is likely to experience difficulty in securing, retaining, or advancing in employment."  21 V.S.A. § 495d(8).

Disability discrimination claims under the VFEPA are subject to the burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Boulton v. CLD Consulting Eng'rs, Inc.*, 2003 VT 72, ¶ 15, 175 Vt.

---

[2]  The Hospital first argues that the VFEPA does not apply because Nadeau was employed in New Hampshire.  Nadeau responds that while his primary workplace was in New Hampshire, he performed some work in Vermont.  The Court need not resolve this issue, as the Hospital is entitled to summary judgment on other, more substantive grounds.

413, 421, 834 A.2d 37, 44 ("In the absence of direct evidence of
unlawful discrimination, which plaintiff has not adduced, this
[c]ourt applies the three-step burden-shifting analysis
articulated in *McDonnell Douglas* . . . to [V]FEPA claims.")
(citation omitted).[3]  Pursuant to this framework, "[a]t the
outset, the plaintiff has the burden of establishing a *prima
facie* case of employment discrimination."  *Robertson v. Mylan
Labs., Inc.*, 2004 VT 15, ¶ 24, 176 Vt. 356, 366, 848 A.2d 310,
320.  To establish a *prima facie* case of disability
discrimination, the plaintiff must show that he is a qualified
disabled individual, that he suffered an adverse employment
action, and the action occurred under circumstances that give
rise to an inference of discrimination.  *Ross v. Times Mirror,
Inc.*, 665 A.2d 580, 586-87 (Vt. 1995).

　　　If the plaintiff is able to present a *prima facie* case of
discrimination, the burden shifts to the defendant to present a
legitimate, non-discriminatory reason for the adverse employment
action.  This burden is one of production, not persuasion.
*Boulton*, 2003 VT 72 ¶ 15.  If the defendant meets this burden,

---

[3]　The Vermont Supreme Court has noted that "[t]he standards and
burdens of proof to be applied under [V]FEPA are the same as those
under Title VII of the federal Civil Rights Act of 1964."  *Carpenter
v. Cent. Vt. Med. Ctr.*, 743 A.2d 592, 594 (Vt. 1999) (entry order)
(citing *Hodgdon v. Mt. Mansfield Co.*, 624 A.2d 1122, 1128 (Vt. 1992));
*cf. Lavalley v. E.B. & A.C. Whiting Co.*, 692 A.2d 367, 369 (Vt. 1997)
(federal court interpretations of Title VII are persuasive but not
binding authority on the interpretation of the VFEPA) (citing
*Hodgdon*).

the burden shifts back to the plaintiff to prove by a
preponderance of the evidence that the legitimate reasons given
are merely a pretext for discrimination.  *Id.*

Retaliation claims operate under this same burden-shifting
paradigm.  A *prima facie* claim of retaliation requires the
plaintiff to show that he was engaged in a protected activity,
that the employer was aware of that activity, that the plaintiff
suffered an adverse employment action, and that there was a
causal connection between the protected activity and the adverse
employment action.  *Gallipo v. City of Rutland*, 2005 VT 83 ¶ 15,
178 Vt. 244, 882 A.2d 1177, 1182.

A.   Whether Nadeau Was Disabled

The Hospital contends that Nadeau is not a disabled
individual because his medical condition did not sufficiently
impede any major life activities.  Nadeau's Complaint alleges
that his condition affects a major life activity in the form of
his "ability to consume food and dispose of bodily waste."  ECF
No. 1-1 at 3, ¶ 17.  Many courts have held that disposing of
bodily waste is a major life activity, although proof of severity
is generally required to show that the condition is substantially
limiting.  *See, e.g., Maziarka v. Mills Fleet Farm*, 245 F.3d 675,
680 (8th Cir. 2001) (finding that plaintiff was disabled by his
irritable bowel syndrome because he experienced "periods of
incapacity [during which he] is prevented from leaving home to go

to work, performing manual tasks, or interacting with
supervisors, co-workers, and store patrons, and is afflicted with
substantial pain and intestinal discomfort"); *Sacay v. Research
Found. of the City Univ. of New York*, 193 F. Supp. 2d 611, 627
(E.D.N.Y. 2002) (determining that plaintiff failed to raise a
genuine issue of material fact that she was disabled because,
although her irritable bowel syndrome required her to be near a
bathroom, she did not produce sufficient evidence of severity).

Here, the evidence indicates that Nadeau's intestinal issues
had the potential to impact his ability to work, most notably
when flare-ups occurred.  At times, his condition required
hospitalization.  In late 2012 and early 2013, he qualified for a
lengthy medical leave in order to recover from illness-related
issues.

Since his termination from the Hospital, Nadeau has been
able to maintain steady employment.  The Hospital argues that
such employment undermines his claims that his disability
prevents him from "securing, retaining, or advancing in
employment."  21 V.S.A. § 495d(8).  The Court disagrees, as
Nadeau's post-termination health is immaterial.  Viewing the
facts in the light most favorable to the non-moving party, the
Court finds that while Nadeau was employed at the Hospital, his
IBD was sufficiently severe that it was capable of impacting his
ability to work, and that he was thus disabled as that term is

defined by the VFEPA.

B.    Whether Nadeau Was Fired Because of His Disability

In addition to his disability, Nadeau must offer evidence to support his claims of discrimination and retaliation.  Indeed, the ultimate question in this case is whether Nadeau's treatment by supervisors, and ultimately his firing, was due to his disability and/or his complaints to Human Resources, and not to his work performance.  This question requires application of the *McDonnell-Douglas* analysis, which first requires Nadeau to show circumstances giving rise to an inference of discrimination.

The undisputed record, even when viewed in Nadeau's favor, offers scant evidence of discriminatory conduct.  Geurkink began noticing Nadeau's performance shortcomings shortly after she joined the Hospital staff in 2012.  She also noted his unprofessional behavior, which was reportedly an issue that pre-dated her hiring.  Discussions among supervisory personnel, including Geurkink, included concerns that Nadeau's position as a supply supervisor was evolving toward process improvement, problem solving, and team building, and questions were raised about whether he continued to be a good fit for such a position. There is no indication in the record that those discussions in mid-2012 had anything to do with Nadeau's disease.

Viewing the facts in Nadeau's favor, Nadeau had his own concerns about his workload, employee management, and the state

22

of his health.  He tried to speak with Geurkink about his health
prior to his complaint to Human Resources in November 2012, but
was frustrated by her focus on day-to-day tasks.  However, when
she invited him to schedule a special meeting to discuss his
health, Nadeau declined.

Shortly after complaining to Human Resources on November 19,
2012, Nadeau raised his health as an issue with Steve Woods.
Woods reportedly failed to respond to his concerns.  During a
subsequent meeting with Geurkink and Woods on November 27, 2012,
Nadeau mentioned the effect of his deteriorating health on his
management abilities.  ECF No. 45-2 at 4 (Nadeau Aff, ¶ 23).
Woods allegedly referred him to the Family Medical Leave Act, and
shortly thereafter Nadeau commenced leave under the FMLA.

It is undisputed that Nadeau returned to work in 2013
without any limitations or restrictions.  Upon his return,
Geurkink found that his work performance was still unacceptable.
Subsequent evaluations reached the same conclusion.  Nadeau
himself conceded in deposition that he was not meeting Geurkink's
expectations.  Though Geurkink specifically invited Nadeau to
highlight any specific training or accommodations that might lead
to improvements, there is no record evidence of any such
requests.  At the time, Nadeau made no allegations of
discrimination on the basis of a disability.

These undisputed facts offer little support for Nadeau's

claim that his supervisors, and Geurkink in particular, were acting in a discriminatory manner because of his disability. Nadeau's best *prima facie* claim is perhaps that the Hospital failed to listen to his concerns about his illness, and correspondingly failed to connect his performance issues to either his illness or related medications.  This raises the question of accommodations, as Nadeau seems to suggest that there was an onus on the employer to invite or implement appropriate accommodations.  Indeed, the Complaint alleges that "[r]ather than accommodate his disability," the Hospital fired Nadeau "because of it."  ECF No. 1-1 (Complaint ¶ 40).

There is no dispute that the only accommodation Nadeau requested was access to a bathroom, and that such access was generally provided.  Courts have widely held that it is "the responsibility of the individual with a disability to inform the employer that an accommodation is needed."  *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006); *see also Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 129 (1st Cir. 2009) ("An employer's duty to accommodate an employee's disability is ordinarily activated by a request from the employee, and the request must be sufficiently direct and specific to give the employer notice of the needed accommodation." (citations and internal quotation marks omitted)); *cf. Bhatt v. Univ. of Vt.*, 184 Vt. 195, 958 A.2d 637, 2008 VT 76, ¶ 20 (explaining that to

24

establish a *prima facie* case under Vermont Public Accommodations Act, plaintiff bears burden of demonstrating that a reasonable accommodation was requested).  Here, Nadeau made no other requests of his employer.

Nadeau claims that the increased work pressure from Geurkink affected his health, which in turn affected his work performance. He makes clear in his affidavit, however, that he was "unaware" of this "reinforcing cycle . . . until I was fired and the pressure was relieved."  ECF No. 45-2 at 3 (Nadeau Aff., ¶ 13). As Nadeau himself was unaware of the full effect of his work duties on his illness, and correspondingly the effect of his illness on his work performance, it is unreasonable to infer that the Hospital – even if it had been more receptive to Nadeau's health concerns – was obligated to perceive this "reinforcing cycle" and design appropriate accommodations.

Accordingly, Nadeau's *prima facie* evidence of either discriminatory conduct, or a failure to accommodate his disability, is exceedingly thin.  Nonetheless, even assuming that he has met his burden in that regard, the Hospital has articulated a series of well-documented, non-discriminatory reasons for its actions.  Geurkink began noticing and documenting Nadeau's shortcomings early in her tenure at the Hospital.  When she shared her perceptions with other supervisors, it became clear that she was not the only one to make such observations.

Geurkink confronted Nadeau on several occasions with respect to his performance, and found him to be, at best, defensive.  She also gave him materials to review, including information about Lean Sigma Six, yet Nadeau apparently made little effort to educate himself about what Geurkink was trying to accomplish.

Geurkink and others offered remediation plans with specific goals, but Nadeau was unable to make the required improvements. According to Geurkink, Nadeau initially missed deadlines approximately 65% of the time, and even after receiving corrective action plans continued to miss deadlines as often as 40% of the time.  Nadeau's behavior was also an issue.  As early as June 2012, shortly after Geurkink was hired by the Hospital, Nadeau was compelled to apologize to her for his behavior.  When he left work early on November 23, 2012, after being expressly denied leave time for that day, his response to Geurkink's inquiries was to decline her calls and refuse any sort of meeting thereafter.  Emails discovered by Geurkink during Nadeau's FMLA leave reportedly included communications that Geurkink found to be inappropriate.

When Nadeau's performance continued to be unsatisfactory, and after months of meetings and efforts at corrective action, Geurkink and Woods decided to terminate his employment.  Although performance issues were certainly a factor, it was Nadeau's behavior – and its potentially negative impact on other warehouse

workers – that appears to have tipped the scale against him. There is no suggestion in the record that Nadeau's illness had any impact on his behavior.

To overcome his employer's statement of non-discriminatory reasons for his firing, Nadeau must show by a preponderance of evidence that those reasons were merely a pretext for discrimination. *Boulton*, 2003 VT 72 ¶ 15.  The undisputed record in this case falls far short of supporting that burden.  Geurkink was aware that Nadeau had a form of IBD.  Nadeau claims that she nonetheless declined to listen to his concerns about his illness. Nadeau testified in his deposition, however, that when he informed Geurkink that his disease was causing him to be ill, Geurkink responded sympathetically and told him to do what was needed to take care of himself.  Geurkink also invited Nadeau to schedule a time to discuss his illness, but Nadeau declined to follow up.

Nadeau offers little evidence to suggest that Geurkink and the Hospital were motivated to fire him because of his IBD, rather than his performance issues.  The overwhelming documentation with regard to Nadeau's final year at the Hospital indicates consistent performance and behavior problems, as well as health concerns to which the employer could – when viewed in a light most favorable to Nadeau – have perhaps been more receptive.  Nonetheless, again viewing the undisputed facts in

27

Nadeau's favor, the Court finds as a matter of law that no
reasonable juror could find, by a preponderance of the evidence,
that the Hospital's actions against Nadeau were taken as a
pretext for discrimination.  The motion for summary judgment on
his disability discrimination claim is therefore **granted.**

C.   Whether Nadeau's Firing Was Retaliatory

Nadeau also alleges that after he complained to Human
Resources, Geurkink took adverse actions in retaliation for his
complaints.  It is undisputed, however, the Nadeau and Geurkink
first contacted Human Resources on the same day, and that
Geurkink was unaware of Nadeau's contact.  Accordingly, at least
with respect to Geurkink's initial communication with Human
Resources, the timing of events undermines Nadeau's claim.

The Hospital further argues that Nadeau's complaint to Human
Resources was not the sort of "protected activity" that forms the
basis of a retaliation claim.  Although Vermont law does not
offer much guidance as to what is considered protected activity
under the VFEPA, under Title VII "[t]he term 'protected activity'
refers to action taken to protest or oppose statutorily
prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d
560, 566 (2d Cir. 2000).  In order for a complaint to form the
basis of a retaliation claim, the employer must have "understood,
or could reasonably have understood, that the plaintiff's
opposition was directed at conduct prohibited" by the relevant

28

employment discrimination statute.  *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998).

Nadeau did not complain to Human Resources about discrimination.  Instead, his initial complaints centered upon the ability of management to control his leave time, as well as communication problems with his immediate supervisor.  Subsequent meetings, which involved Steve Woods from Human Resources, pertained primarily to performance issues and did not allege unlawful conduct.  Given this record, no reasonable juror could conclude that Nadeau's communications with Human Resources raised the issue of unlawful employment discrimination.

Nor could a reasonable juror find that Nadeau's contacts with Human Resources were a factor in his firing.  The process of correcting Nadeau's work performance and behavior began before either Nadeau or Geurkink contacted Human Resources.  As early as summer 2012, Geurkink noted her concerns and encouraged Nadeau to learn about the new efficiency methods she was trying to implement.  Although Nadeau disputes whether those concerns were justified, as well as the frequency of his discussions with Geurkink, he does not dispute whether such discussions occurred. *See* ECF No. 45-1 at 4-5 (Plaintiff's Response to Defendant's Statement of Undisputed Facts, ¶ 39); ECF No. 40-30 at 33 (Nadeau Dep. at 129).

Nadeau's filings allege that as part of her retaliatory

29

acts, Geurkink burdened him with an unreasonable workload.  The record indicates that Nadeau's concerns about his workload began as early as 2008 or 2009 with the departure of June Brown. Nadeau complained to his prior supervisor, David Fittro, but reports that Fittro provided no relief.  When Geurkink was hired, she implemented new protocols and introduced Nadeau to Lean Sigma Six.  Nothing in the timing of those initiatives suggests that they were retaliatory.  Geurkink denies any sort of retaliation, and no reasonable juror could find to the contrary.  Summary judgment on the issue of retaliation is therefore **granted**.

III. State Law Contract Claims

In addition to his claim under the VFEPA, Nadeau brings common law contract claims for breach of an implied employment contract and breach of the implied covenant of good faith and fair dealing.  The parties agree that because Nadeau was employed in New Hampshire, New Hampshire law applies to his common law claims.  There is also no dispute that Nadeau was an at-will employee.  New Hampshire law provides that the terms of at-will employment may be defined or modified by employer handbooks and policy statements.  *See, e.g., Panto v. Moore Bus. Forms, Inc.*, 547 A.2d 260, 261-61, 268 (N.H. 1988) (holding that statement by employer may be viewed as an offer to modify the contractual relationship between employer and employee).

Nadeau's implied contract claim alleges that according to

30

Hospital policy, the employer cannot retaliate against an employee for either filing a grievance or complaining about treatment by supervisors.  The Hospital counters that the policy applies only to retaliation for filing a grievance.  In any event, this case presents little evidence of retaliation for either a grievance or more general complaints.

Discussions about Nadeau's work performance occurred both before and after his complaints.  Workload issues were ongoing from at least 2009 through Nadeau's termination.  Also, as noted above, it was Geurkink who reminded Nadeau about his right to file a grievance with respect to her written warning.  Based upon this record, no reasonable juror could conclude that Nadeau's complaints about his treatment played a role in his firing.

Nadeau's good faith and fair dealing claim relates to his work laptop and email issues.  The New Hampshire Supreme Court has explained that

> [i]n every agreement, there is an implied covenant that the parties will act in good faith and fairly with one another.  *Livingston v. 18 Mile Point Drive*, 158 N.H. 619, 624, 972 A.2d 1001 (2009).  In New Hampshire, there is not merely one rule of implied good-faith duty, but a series of doctrines, each of which serves a different function.  *Id.*  The various implied good-faith obligations fall into three general categories: (1) contract formation; (2) termination of at-will employment agreements; and (3) limitation of discretion in contractual performance.  *Id.*

*Birch Broadcasting, Inc. v. Capitol Broadcasting Corp., Inc.*, 13 A.3d 224, 229-30 (N.H. 2010).  As Nadeau's good faith and fair

dealing claims do not pertain to either contract formation or his termination, but rather his treatment while employed, the Court turns to the third category.  "While the third category is comparatively narrow, its broader function is to prohibit behavior inconsistent with the parties' agreed-upon common purpose and justified expectations, as well as with common standards of decency, fairness and reasonableness." *Livingston*, 972 A.2d at 1006 (citation and internal quotations omitted).

Here, Nadeau claims that the parties' common purpose and expectation was that laptops could be used, and emails accessed, at an employee's home.  It is plain from the record, however, that the laptop was the property of the Hospital, and that Hospital policy barred Nadeau from working at home during his leave.  Nadeau also conceded that Geurkink had legitimate business reasons for accessing his emails.  Finally, the New Hampshire Supreme Court has rejected the argument that an employer has a general obligation to act in good faith and deal fairly with at-will employees.  *J & M Lumber and Const. Co. v. Smyjunas*, 20 A.3d 947, 958 (N.H. 2011).  The Hospital's motion for summary judgment with respect to Nadeau's state law claims is therefore **granted**.

## Conclusion

For the reasons set forth above, the Hospital's motion for summary judgment (ECF No. 40) is **granted**, and this case is

**dismissed.**

Dated at Burlington, in the District of Vermont, this 13th day of June, 2016.

/s/ William K. Sessions III
William K. Sessions III
District Court Judge